ATTORNEY FOR PETITIONER:
**ROBERT A. ROMACK**
Franklin, IN

ATTORNEYS FOR RESPONDENT:
**GREGORY F. ZOELLER**
ATTORNEY GENERAL OF INDIANA
**EVAN W. BARTEL**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

_____

# IN THE
# INDIANA TAX COURT

**FILED**

Jun 23 2015, 3:01 pm

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

_____

|  |  |  |
|---|---|---|
| AZTEC PARTNERS, LLC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Cause No. 49T10-1210-SC-00067 |
| | ) | |
| INDIANA DEPARTMENT OF | ) | |
| STATE REVENUE, | ) | |
| | ) | |
| Respondent. | ) | |

_____

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA DEPARTMENT OF STATE REVENUE

**FOR PUBLICATION**
**June 23, 2015**

WENTWORTH, J.

This case examines whether the electricity that Aztec Partners, LLC used to power certain equipment between January 1, 2010, and March 31, 2011 (the period at issue) was subject to Indiana sales tax.[1] The Court finds that it was not.

**FACTS AND PROCEDURAL HISTORY**

Aztec, a domestic limited liability company, operates nineteen Qdoba Mexican

_____

[1] The Department has designated evidence that contains confidential information. Accordingly, the Court will provide only that information necessary for the reader to understand its disposition of the issues presented. See generally Ind. Administrative Rule 9.

Restaurants in Indiana. (See Jt. Stip. ¶ 1; Resp't Des'g Evid., Ex. N at 1; Pet'r Trial Ex. 1 ¶¶ 1, 3.) Aztec's employees prepare certain food items, such as salsa, chicken, chorizo, eggs, rice, lettuce, and tortilla chips, that are ultimately combined into the entrées that are served at these restaurants. (See Jt. Stip. ¶ 6; Pet'r Trial Ex. 1 ¶ 4.) Aztec uses deluxe food warmers, hot food cabinets, food bar heating/cooling systems, walk-in coolers, and chip warmers (collectively, the electrical equipment) to hold and preserve the prepared food items at certain temperatures until they are combined into the entrées that are sold to customers. (See Jt. Stip. ¶¶ 3-6, 8; Pet'r Trial Ex. 1 ¶ 5.) Aztec does not use any of the electrical equipment to cook food. (Jt. Stip. ¶ 7.)

In June of 2011, Aztec filed twelve refund claims with the Department seeking, among other things, a refund of the sales tax it paid on the electricity it used to power the electrical equipment. (See Jt. Stip. ¶ 2; Resp't Des'g Evid., Exs. B-M; Trial Tr. at 10-11.) The Department, however, found that the electricity was taxable. (See Jt. Stip. ¶ 9; Resp't Des'g Evid., Exs. B-M.) Aztec protested the Department's refund claim denials. (Jt. Stip. ¶ 10.) On August 24, 2012, after holding a hearing, the Department issued a Memorandum of Decision denying Aztec's protest. (Jt. Stip. ¶¶ 10-11.)

On October 24, 2012, Aztec initiated an original tax appeal as a small tax case. On July 12, 2013, the parties tried the case before the Court. Additional facts will be supplied as necessary.

**STANDARD OF REVIEW**

The Court reviews refund claim denials of the Department de novo. IND. CODE § 6-8.1-9-1(c)-(d) (2015). Accordingly, the Court is not bound by the evidence or the issues presented at the administrative level. Horseshoe Hammond, LLC v. Indiana

2

<u>Dep't of State Revenue</u>, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), <u>review denied</u>.

**LAW & ANALYSIS**

On appeal, Aztec contends that the electricity it used to power its electrical equipment was exempt from sales tax under Indiana Code § 6-2.5-5-5.1 (the consumption exemption).[2] (<u>See</u> Pet'r Mem. Law Supp. Contentions ("Pet'r Br.") at 6-8.) The Department contends, on the other hand, that the Court lacks subject matter jurisdiction over Aztec's claim. (<u>See</u> Resp't Br. Resp. [Pet'r Br.] ("Resp't Br.") at 7-8.) Alternatively, the Department contends that Aztec's use of electricity to power the electrical equipment did not qualify for the consumption exemption. (<u>See</u> Resp't Br. at 9-12.)

**Subject Matter Jurisdiction**

Subject matter jurisdiction is the power of a court to hear and determine a particular class of cases. <u>Grandville Coop., Inc. v. O'Connor</u>, 25 N.E.3d 833, 836 (Ind. Tax Ct. 2015). The Tax Court has subject matter jurisdiction over cases that arise under the tax laws of Indiana and are initial appeals of final determinations made by the Department regarding the listed taxes. <u>See</u> IND. CODE §§ 33-26-3-1(1), -3 (2015); <u>Grandville</u>, 25 N.E.3d at 836 (explaining that the final determination requirement includes the exhaustion of administrative remedies requirement).

The Department claims that the Court lacks subject matter jurisdiction because Aztec's refund claims requested an exclusion from sales tax, not an exemption from sales tax. (<u>See</u> Resp't Br. at 7-8; Trial Tr. at 29-32 (explaining that during the

---

[2]  Aztec also claims that the electricity that powered its electrical equipment was excluded from sales tax pursuant to Indiana Code § 6-2.5-4-5(c)(3) (the predominate use exclusion). (<u>See</u> Pet'r Mem. Law Supp. Contentions ("Pet'r Br.") at 4-8.) Given the disposition of this case, however, the Court will not address this claim.

3

administrative process, Aztec used the words "exclusion" and "exemption" interchangeably, creating ambiguity as to the basis for its refund claims).) As a result, the Department claims that Aztec failed to exhaust its administrative remedies because it did not obtain a final determination regarding its eligibility for the consumption exemption, given that it did not specifically identify that exemption as a basis for its refund claims. (See Resp't Br. at 8; Trial Tr. at 36-37.) The Department's argument is unpersuasive for the following two reasons.

First, there are only two ways that a taxpayer can receive a final determination from the Department (i.e., exhaust its administrative remedies): 1) pay the taxes owed, request a refund, and file a petition in the Tax Court when the refund is denied; or 2) protest the assessment of the tax and, upon receiving an adverse letter of findings, appeal to the Tax Court. See State v. Sproles, 672 N.E.2d 1353, 1357 (Ind. 1996); Etzler v. Indiana Dep't of State Revenue, 957 N.E.2d 706, 708-09 (Ind. Tax Ct. 2011). Here, the stipulated facts show that Aztec pursued both of these avenues. (Jt. Stip. ¶¶ 9-11.) Thus, Aztec obtained a final determination from the Department before initiating its appeal.

Second, whether Aztec sought a refund based on the consumption exemption at the administrative level does not implicate the Court's subject matter jurisdiction. Indeed, "subject matter jurisdiction does not depend upon the sufficiency or correctness of the averments in [a] complaint, the stating of a good cause of action, the validity of [a party's] demand, or [a party's] right to relief." In re Adoption of H.S., 483 N.E.2d 777, 780 (Ind. Ct. App. 1985). See also, e.g., Pivarnik v. N. Ind. Pub. Serv. Co., 636 N.E.2d 131, 137 (Ind. 1994) (stating that subject matter jurisdiction concerns the power of a

court to decide particular <u>kinds</u> of cases, not the intricacies of pleading). Accordingly, the Court finds that it has subject matter jurisdiction over this case.

**The Consumption Exemption**

It is well established that exemption statutes are strictly construed against the taxpayer. <u>See</u> <u>Indianapolis Fruit Co. v. Dep't of State Revenue</u>, 691 N.E.2d 1379, 1383 (Ind. Tax Ct. 1998). Furthermore, the taxpayer bears the burden of proving entitlement to the exemption it seeks. <u>Id</u>. During the period at issue, the consumption exemption provided that

> [t]ransactions involving [electrical energy] are exempt from [sales tax] if the person acquiring the [electrical energy] acquires it for direct consumption as a material to be consumed in the direct production of other tangible personal property in the person's business of manufacturing, processing, refining, repairing, mining, agriculture, horticulture, floriculture, or arboriculture.

<u>See</u> IND. CODE § 6-2.5-5-5.1(a)-(b) (2010) (amended 2011). To qualify for this exemption, Aztec must show that: 1) it is engaged in production, 2) it has an integrated production process, and 3) the electricity is essential and integral to its integrated production process. <u>See, e.g.</u>, <u>Indianapolis Fruit</u>, 691 N.E.2d at 1383-84.

**1. Engaged in Production**

"[T]here is one iron-clad rule: without production there can be no exemption." <u>Id.</u> at 1384 (citations omitted). "[W]hether production is occurring depends on the factual circumstances of [each] case." <u>Id.</u> In any event, production requires a "substantial" change or transformation resulting from "an integrated series of operations [that] places tangible personal property in a form, composition, or character different from that in which it was acquired." 45 IND. ADMIN. CODE 2.2-5-8(k) (2010) (see http://www.in.gov/legislative/iac/). Although "production is 'defined broadly[,]' [it]

5

'focuses on the creation of a marketable good.'" Indianapolis Fruit, 691 N.E.2d at 1383-84 (citations omitted); see also Harlan Sprague Dawley, Inc. v. Indiana Dep't of State Revenue, 605 N.E.2d 1222, 1226-30 (Ind. Tax Ct. 1992) (explaining that production has the same meaning under the equipment, incorporation, and consumption exemptions).

Aztec claims that it is engaged in production because it creates marketable products, i.e., the entrées, when it prepares and then combines food items. (See Pet'r Br. at 8.) The Department, however, contends that Aztec is not engaged in production when combining cooked chicken, steamed tortilla shells, and other food items into entrées because these activities do not substantially transform the food items either physically or chemically. (See Resp't Br. at 9-11; Trial Tr. at 47-53.)

"With respect to food items, this Court has held that a taxpayer is entitled to the equipment exemption when its equipment is directly used to induce a substantial chemical change in the food, thereby transforming the food into a new, marketable product." Trump Indiana, Inc. v. Indiana Dep't of State Revenue, 790 N.E.2d 192, 196 (Ind. Tax Ct. 2003) (citing Indianapolis Fruit, 691 N.E.2d at 1383-84), rev'd on other grounds, 814 N.E.2d 1017 (Ind. 2004). The Court has also held, however, that a wholesale supplier of fruits and vegetables is engaged in production when it cleans, cuts, and packages the fruits and vegetables for resale despite the lack of a chemical change in the fruits and vegetables. See Indianapolis Fruit, 691 N.E.2d at 1381-83.

Here, the parties have stipulated that Aztec's electrical "equipment . . . hold[s] food items prepared by [Aztec] that will be combined into [the] entrées that are sold by [Aztec]." (Jt. Stip. ¶ 6.) Accordingly, Aztec's preparation and combination of the food items into entrées substantially changed the individual food items into new, marketable

6

products that have a character and form different from the food items first acquired. The Court, therefore, finds that Aztec was engaged in production during the period at issue.

## 2. Integrated Production Process

The Department's regulations provide that production "begins at the point of the first operation or activity constituting part of the integrated production process and ends at the point that the production has altered the item to its <u>completed form</u>, including packaging, if required." 45 I.A.C. 2.2-5-8(d) (emphasis added). Moreover, this Court has explained that "[t]he end of an integrated production process is not signaled by the production of unfinished work in process merely because it is potentially a finished marketable product. An integrated production process terminates upon the production of the most marketable finished product, <u>e.g.</u>, the product actually marketed." <u>General Motors Corp. v. Indiana Dep't of State Revenue</u>, 578 N.E.2d 399, 404 (Ind. Tax Ct. 1991), <u>aff'd</u>, 599 N.E.2d 588 (Ind. 1992).

Aztec claims that the electricity that powered its electrical equipment qualified for the consumption exemption because it was consumed within an integrated production process that began when Aztec prepared the food items and ended when the food items were combined into the entrées that were sold to customers. (<u>See</u> Pet'r Br. at 6-8; Trial Tr. at 13-15.) The Department, on the other hand, claims that the electricity is taxable because it was consumed in providing a service, not in an integrated production process. (<u>See</u> Trial Tr. at 49-55.) More specifically, the Department contends that Aztec's production process ends when it cooks chicken or steams tortillas, and, therefore, because the electricity powered the electrical equipment that merely held the

7

prepared food items for subsequent combination into an entrée, the electricity was consumed in providing a post-production service.[3] (See Trial Tr. at 53-55.)

As just mentioned, the parties stipulated that Aztec's electrical "equipment . . . hold[s] food items prepared by [Aztec] that will be combined into [the] entrées that are sold by [Aztec]." (Jt. Stip. ¶ 6.) The parties also stipulated that "[t]he purpose of the [electrical] equipment . . . is to preserve the food items until they are combined into entrées that are sold by [Aztec]." (Jt. Stip. ¶ 8.) Therefore, the uncontroverted evidence shows that Aztec engages in several steps before an entrée is completed for sale: it prepares, holds/preserves, and combines certain food items. Moreover, there is no evidence that demonstrates that Aztec sells the prepared food items separately. (See Jt. Stip. ¶¶ 6, 8; Pet'r Trial Ex. 1 ¶¶ 1-5) Accordingly, the Court finds that Aztec has an integrated production process and that, during the period at issue, the electricity that Aztec used to power its electrical equipment was consumed in that process. See, e.g., General Motors, 578 N.E.2d at 404; 45 I.A.C. 2.2-5-8(d).

### 3. Essential and Integral

The Indiana Supreme Court has explained that equipment used within an integrated production process qualifies for an exemption when the equipment has an "immediate effect" on the property being produced. See Indiana Dep't of State Revenue v. Cave Stone, Inc., 457 N.E.2d 520, 525-27 (Ind. 1983). The phrase "immediate effect" means that the equipment is "essential and integral" to the taxpayer's integrated production process. See id. Thus, Aztec's electricity will qualify for the consumption

---

[3] In the course of making this argument, the Department distinguished between mass produced items that are not individually ordered and Aztec's made-to-order entrées, as well as the amount of waste Aztec may incur in comparison to the waste of other producers. (See Trial Tr. at 53-55, 61-65.) Nonetheless, the Department did not show how these distinctions have any legal significance in this case.

exemption if it was essential and integral to Aztec's integrated production process.

Aztec asserts that the electricity that powered its electrical equipment qualified for the consumption exemption because it was essential and integral to its integrated production process. (See Trial Tr. at 18-20.) The Department counters that the electricity that powered Aztec's electrical equipment is not essential and integral to its integrated production process because the electricity did not chemically change the food items, but instead simply held them at certain temperatures for eventual combination into entrées. (See Trial Tr. at 65-69.) The Department explains that the electricity that powered Aztec's electrical equipment is analogous to the hotdog bun warmer and microwave oven in Trump that failed to qualify for the equipment exemption because they merely were used to keep certain ingredients warm or cool, not to directly induce a substantial change in the ingredients to create new marketable products. (See Trial Tr. at 45-48, 65-69 (referring to Trump, 790 N.E.2d at 196).) The Department's argument, however, is unpersuasive for three reasons.

First, the Department misinterprets the rationale in Trump that led this Court to find that the hotdog bun warmer and microwave oven did not qualify for the equipment exemption. Specifically, the Court's finding in Trump was due exclusively to the taxpayer's failure to provide evidence "showing that to merely warm food induces a substantial chemical transformation in the food that results in a new, marketable product." Trump, 790 N.E.2d at 196. Consequently, Trump did not create a per se rule that the warming or cooling of food could not be essential and integral to production.

Second, the Indiana Supreme Court has explained that equipment used in an integrated production process, like the consumption of the electricity here, must be

9

essential and integral to that process, not directly transformational.  See Cave Stone, 457 N.E.2d at 524 (finding that even though the taxpayer's equipment did not transform its property, the equipment was essential and integral to the process of transformation because no marketable product would have resulted without it).  "Often, this determination is made by identifying the points where production begins and where it ends."  Indianapolis Fruit, 691 N.E.2d at 1384 (citing General Motors, 578 N.E.2d at 404).  See also, e.g., Wendt LLP v. Indiana Dep't of State Revenue, 977 N.E.2d 480, 483-88 (Ind. Tax Ct. 2012) (identifying the beginning and end of a taxpayer's public transportation process to determine whether the taxpayer's use of property was necessary and integral to that process).  Accordingly, Aztec did not need to show that the electricity had a transformational effect on the food items to demonstrate that the electricity was essential and integral to Aztec's integrated production process.

Finally, the Department's argument disregards that "[t]he purpose of the [electrical] equipment . . . is to preserve the food items [at certain temperatures] until they are combined into [entrées] that are sold by [Aztec]." (See Jt. Stip. ¶ 8 (emphases added).) (See also Jt. Stip. ¶¶ 4-5.)  The Department strains to distinguish the action of preserving from an action more directly transformative like cooking. (See Resp't Br. at 9-11.)  Nonetheless, this type of distinction is ineffective because it fails to address the decisive question:  whether using electricity to preserve food items is essential and integral to combining them into Aztec's entrées, i.e., its marketable products.  Here, the use of electricity to preserve the food items at certain temperatures is essential and integral to Aztec's integrated production process because without it, Aztec could not produce the entrées.  (See Trial Tr. at 18-19 (explaining that food items must be

10

maintained at certain temperatures to produce the entrées).)  Accordingly, the Court finds that during the period at issue the electricity that powered the electrical equipment that held and preserved the food items was essential and integral to Aztec's integrated production process.

## CONCLUSION

For all the reasons stated above, the Court REVERSES the Department's final determination.  Therefore, the Court REMANDS this matter to the Department so that it may take the actions necessary to give full effect to this opinion.